## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT MICHIGAN SOUTHERN DIVISION

---

**ERIC LEE BOUIE,**

       **Plaintiff,**                       **Case No. 2:25-cv-10132**

                                              **Hon. Linda V. Parker**

**-vs-**                                  **Mag. Elizabeth A. Stafford**

**J. SALYERS**

**AHMED ALZAYADI,**

**JORGE LANDEROS, OAKLAND COUNTY,**
**OAKLAND COUNTY SHERIFF'S DEPARTMENT**
**MULTIPLE JOHN DOE**

        **Defendants.**

---

## PLAINTIFF'S AMENDED COMPLAINT AND JURY DEMAND

**NOW COMES** Plaintiff **ERIC BOUIE** ("Plaintiff"), by and through his undersigned counsel, and for his Amended Complaint against the above-named Defendants, hereby states as follows:

1. This is a civil rights action brought pursuant to **42 U.S.C. § 1983**, the **Fourth and Fourteenth Amendments** to the United States Constitution, and applicable Michigan common and statutory law, arising from the unlawful and unconstitutional actions of deputies employed by the **Oakland**

**County Sheriff's Department** and the failure of **Oakland County** and its law enforcement leadership to properly train, supervise, and discipline said deputies.

2. Plaintiff seeks redress for violations of his **right to be free from unreasonable searches and seizures, unlawful detention and arrest, deprivation of due process**, and **invasion of privacy** that occurred on or about **December 24–25, 2023**, at his private residence in Oakland County, Michigan.

3. Plaintiff alleges that on that date, Defendants, acting under color of state law, unlawfully entered his residence without a warrant or any valid legal justification, and forcibly seized his person, all while muting or obstructing the audio functionality of their body-worn cameras, in direct violation of established police practices, constitutional protections, and their own departmental policies.

4. Plaintiff further alleges that Defendants' actions were not isolated incidents but were carried out in accordance with customs, practices, and policies of **Oakland County** and the **Oakland County Sheriff's Department**, and were the product of **deliberate indifference** to the rights of citizens, including Plaintiff.

5. Plaintiff incorporates by reference the **Expert Report of Todd L. Mutchler,** a former law enforcement executive with more than 38 years of experience, which finds that the deputies' conduct **substantially deviated from nationally accepted law enforcement practices and constitutional norms,** particularly with regard to warrantless entry and the proper use of body-worn recording systems.

## INTRODUCTION

1. The within incorporates by reference any and all paragraphs previously.

2. This is a civil rights action brought pursuant to **42 U.S.C. § 1983** to redress violations of **Plaintiff Eric Bouie's constitutional rights** by members of the **Oakland County Sheriff's Office** and the municipal entities responsible for their supervision, training, and discipline.

3. On **December 24–25, 2023,** deputies from the Oakland County Sheriff's Office entered Plaintiff's home without a warrant, without exigent circumstances, and without lawful consent. Once inside, they unlawfully detained, searched, and seized Plaintiff in violation of his rights under the **Fourth Amendment** to the United States Constitution.

4. The deputies also engaged in acts intended to **conceal their conduct** by deliberately obstructing the audio functionality of their department-issued

**body-worn cameras (BWCs)**—an act which lasted for several minutes and is clearly visible on recorded video footage. These actions were taken with the intent to suppress critical contemporaneous evidence and avoid accountability, in violation of Plaintiff's rights under the **Fourteenth Amendment**.

5. Plaintiff incorporates by reference the **Expert Report of Todd L. Mutchler**, dated **November 16, 2025**, attached hereto as **Exhibit A**, and pleads its factual findings and expert opinions as part of this Complaint.

6. Mr. Mutchler is a law enforcement expert with **more than 38 years of experience** in policing, supervision, administration, training, and use-of-force oversight, including service as a Director of Public Safety and training instructor for law enforcement officers throughout Michigan.

7. Based on his review of four body-worn camera videos, agency accreditation standards, and applicable professional law enforcement protocols, Mr. Mutchler concluded that the deputies' actions:

   a. **Deviated substantially from generally accepted police practices**;

   b. **Violated key constitutional protections** against warrantless searches and unlawful seizures;

   c. **Breach departmental policies and accreditation standards**, including those promulgated by the International Association of Chiefs of Police

(IACP), the Michigan Law Enforcement Accreditation Commission (MLEAC), and other national policing standards; and

d. **Reflected intentional misconduct**, including the suppression of body-worn camera audio and improper escalation to unlawful home entry without proper legal justification.

8. As a direct and proximate result of Defendants' actions, Plaintiff suffered:

a. The **invasion of his home and privacy**;

b. An **unlawful search and seizure**;

c. **Emotional distress, fear**, and **humiliation**;

d. **Violation of his clearly established constitutional rights** under the Fourth and Fourteenth Amendments.

9. This lawsuit seeks **compensatory damages, punitive damages, injunctive and declaratory relief**, and **attorney's fees** pursuant to **42 U.S.C. § 1988**, for the violations of Plaintiff's rights committed by the individually named deputies and the municipal entities that failed to train, supervise, or discipline them appropriately.

## PARTIES

9. The within incorporates by reference any and all paragraphs previously.

10. **Plaintiff ERIC BOUIE** is a natural person and a citizen of the United States who resides in **Oakland County, Michigan**. At all relevant times, Plaintiff was lawfully present at his residence in Oakland County and was not subject to any outstanding warrants, lawful orders of arrest, or judicial process authorizing entry or seizure by law enforcement.

11. At all relevant times, Plaintiff was entitled to the full protection of the **United States Constitution**, including the **Fourth Amendment right to be secure in his person, house, papers, and effects against unreasonable searches and seizures**, and the **Fourteenth Amendment right to due process of law and equal protection under the law**.

12. **Defendant OAKLAND COUNTY** is a municipal government entity organized and operating under the laws of the **State of Michigan**. Defendant County is responsible for establishing and maintaining the Oakland County Sheriff's Office, promulgating policies governing its law enforcement operations, and overseeing the hiring, training, supervision, and discipline of its employees, including the individual law enforcement officers named herein.

13. **Defendant OAKLAND COUNTY SHERIFF'S DEPARTMENT (OCSD)** is a division of Oakland County and the primary law enforcement agency responsible for policing unincorporated areas of the County and providing

other services, including warrant enforcement and domestic incident response. OCSD is a **Michigan Law Enforcement Accreditation Commission (MLEAC)–accredited agency** and is required to comply with constitutional standards and professional best practices for law enforcement conduct, including the use of body-worn cameras and warrantless entries.

14. At all relevant times, **OCSD** was acting as an arm of the County government and was directly responsible for the policies, procedures, training, supervision, and discipline of its deputies and supervisory personnel. Defendant OCSD is subject to suit under **Monell v. Department of Social Services**, 436 U.S. 658 (1978), for constitutional violations arising from its customs, practices, policies, and failures in training and supervision.

15. **Defendant DETECTIVE J. SALYERS** is, upon information and belief, a sworn law enforcement officer employed by the Oakland County Sheriff's Department. At all times relevant to this Complaint, Defendant Salyers acted under color of law, and in both his **individual and official capacities** as a deputy or detective with the OCSD.

16. **Defendant OFFICER A. ALZAYADI** is, upon information and belief, a sworn law enforcement officer employed by the Oakland County Sheriff's Department. At all times relevant hereto, Defendant Alzayadi acted under color of law and in both his **individual and official capacities**.

17. **Defendant OFFICER J. LANDERSOS** is, upon information and belief, a sworn law enforcement officer employed by the Oakland County Sheriff's Department. At all relevant times, Defendant Landersos acted under color of state law and in both his **individual and official capacities**.

18. **Defendants DEPUTY JOHN DOE 1, DEPUTY JOHN DOE 2, and DEPUTY JOHN DOE 3** are presently unidentified deputies employed by the OCSD, who participated in the unconstitutional entry, search, seizure, and concealment of audio evidence related to the incident involving Plaintiff. These defendants acted under color of law and in both their **individual and official capacities**. Plaintiff will seek to amend this Complaint to identify these individuals by name once their identities are revealed through discovery.

19. At all times mentioned in this Complaint, each **individual Defendant** was acting **under the authority, direction, supervision, and policies of Oakland County and the Oakland County Sheriff's Department**, and within the course and scope of his employment as a sworn peace officer. Each of the individual Defendants is sued **individually and in his official capacity** for actions taken under color of state law.

20. Each of the actions and omissions described herein was undertaken by Defendants with actual or constructive knowledge of their unlawfulness, and with **deliberate indifference** to the constitutional rights of Plaintiff.

## JURISDICTION AND VENUE

21. The within incorporates by reference any and all paragraphs previously.

22. This action arises under the **Constitution and laws of the United States**, including **42 U.S.C. § 1983**, which provides a civil remedy for the deprivation of rights secured by the Constitution and laws of the United States by persons acting under color of state law.

23. This Court has **original jurisdiction** over this matter pursuant to **28 U.S.C. § 1331**, as the action arises under the **Fourth and Fourteenth Amendments to the United States Constitution**, and under the laws of the United States.

24. This Court also has jurisdiction under **28 U.S.C. § 1343(a)(3) and § 1343(a)(4)**, which confer original jurisdiction over actions authorized by law to be brought by any person to redress the deprivation, under color of state law, of any right, privilege, or immunity secured by the Constitution or by any Act of Congress providing for equal rights.

25. This Court has **supplemental jurisdiction** over Plaintiff's state law claims, if any, pursuant to **28 U.S.C. § 1367**, because those claims are so related to

Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

26. Venue is proper in the **United States District Court for the Eastern District of Michigan** pursuant to **28 U.S.C. § 1391(b)(1) and (2)**, because:

a. One or more Defendants reside or are employed within this judicial district and are subject to the Court's personal jurisdiction; and

b. A substantial part of the events or omissions giving rise to the claims occurred within **Oakland County, Michigan**, which is located within the **Southern Division of this District**.

27. The events giving rise to Plaintiff's claims, including the unlawful entry into Plaintiff's home, the unconstitutional search and seizure, the intentional muting of audio evidence, and all other misconduct alleged herein occurred in **Oakland County**, making venue in this District appropriate.

## PARTIES

28. The within incorporates by reference any and all paragraphs previously.

29. Plaintiff **ERIC BOUIE** is a natural person and a citizen of the United States who resides in **Oakland County, Michigan**. At all times relevant to this action, Plaintiff was lawfully present at his private residence in said county

and was not subject to any warrant, court order, or legal process authorizing the entry of his home or seizure of his person.

30. Plaintiff brings this action to vindicate his rights under the **Fourth and Fourteenth Amendments** to the United States Constitution, including his right to be free from unreasonable searches and seizures, the right to privacy in his home, and the right not to be deprived of liberty or property without due process of law.

31. Defendant **OAKLAND COUNTY** is a municipal corporation organized under the laws of the State of Michigan. It is responsible for funding, staffing, supervising, and operating the **Oakland County Sheriff's Department (OCSD)** and for adopting policies, customs, and practices related to law enforcement activities in the County.

32. Defendant Oakland County is a "person" within the meaning of **42 U.S.C. § 1983** and is subject to liability for constitutional violations caused by its customs, policies, practices, failures to train, supervise, or discipline its officers, and deliberate indifference to known risks of unconstitutional conduct.

33. Defendant **OAKLAND COUNTY SHERIFF'S DEPARTMENT (OCSD)** is a division of Oakland County charged with providing law enforcement

services throughout the County, including patrol, criminal investigation, warrant execution, and response to domestic incidents.

34. OCSD is a **Michigan Law Enforcement Accreditation Commission (MLEAC)**–accredited agency and is required to implement and adhere to established professional standards concerning warrantless searches, arrest procedures, body-worn camera use, evidence preservation, and supervision of personnel.

35. At all relevant times, the OCSD was acting under the direction and control of Oakland County and is responsible for the acts and omissions of the individual officers and deputies employed therein.

36. Defendant **DETECTIVE J. SALYERS** is, upon information and belief, a sworn law enforcement officer employed by the OCSD. At all relevant times, he was acting under color of law, and within the scope of his official duties, and is sued in both his **individual** and **official** capacities.

37. Defendant **OFFICER A. ALZAYADI** is, upon information and belief, a sworn law enforcement officer employed by the OCSD. At all relevant times, he was acting under color of law and within the scope of his employment, and is sued in both his **individual** and **official** capacities.

38. Defendant **OFFICER J. LANDERSOS** is, upon information and belief, a sworn law enforcement officer employed by the OCSD. At all relevant

times, he was acting under color of law and within the scope of his employment, and is sued in both his **individual** and **official** capacities.

39. Defendants **DEPUTY JOHN DOE 1**, **JOHN DOE 2**, and **JOHN DOE 3** are presently unknown individuals employed by the OCSD who participated in the unconstitutional acts described in this Complaint. These defendants are believed to have been personally involved in the unlawful entry, detention, and audio obstruction related to Plaintiff's incident. They are sued in both their **individual** and **official** capacities. Plaintiff will amend this Complaint to name these individuals once their identities are determined through discovery.

40. At all times relevant to this action, each of the individual defendants was acting under the color of state law and in accordance with or as a result of policies, customs, or practices implemented, approved, or tolerated by Oakland County and the OCSD.

41. Each of the individual defendants was either directly involved in the unlawful conduct or failed to intervene to prevent it, despite having a reasonable opportunity and legal duty to do so.

42. The acts and omissions of the individual defendants were intentional, reckless, and carried out with deliberate indifference to Plaintiff's constitutional rights.

## FACTUAL ALLEGATIONS

42.a. The within incorporates by reference any and all paragraphs previously.

43. On the evening of **December 24, 2023**, at approximately **11:30 p.m.**, deputies from the **Oakland County Sheriff's Department** were dispatched in response to a domestic disturbance report made by **Desiree McCullough**, the mother of two of Plaintiff's children.

44. Ms. McCullough was **not residing** at Plaintiff's residence at the time of the report. She alleged that during a custody exchange that took place earlier that day at the residence of Plaintiff's mother, Plaintiff **Eric Bouie** had threatened her with a knife.

45. Deputies also took a second-hand statement from McCullough's cousin, **Juanita Ball**, who claimed to have overheard an argument and some threats allegedly made by Plaintiff. No physical injuries were reported, and **no request for immediate protective custody or assistance** was made by either woman.

46. Deputies proceeded directly to Plaintiff's home, arriving at approximately **11:59 p.m.**, without first seeking or obtaining an **arrest warrant, search warrant**, or any form of judicial authorization.

47. Upon arrival, the deputies attempted to make contact by **knocking on the door** and **ringing the doorbell**. Plaintiff did not answer the door in person but communicated with deputies via a **two-way video Ring-type doorbell device**.

48. Body-Worn Camera (BWC) footage later reviewed by expert **Todd L. Mutchler** confirms that the interaction between Plaintiff and the deputies via the doorbell was calm and non-threatening. At no point did Plaintiff make any threats, display any weapons, or otherwise create a situation indicative of **exigent circumstances**, **hot pursuit**, or **imminent danger**.

49. Despite this, the deputies made the decision to forcibly **enter Plaintiff's home without consent** and without legal justification. The BWC footage reveals that no attempt was made to articulate an exigent circumstance, nor was there any observed emergency inside the residence.

50. Crucially, during this sequence, the BWC footage also reveals that deputies **intentionally muted or obstructed the audio recording** of their body-worn cameras. Specifically, the deputy wearing **BWC2-093248** is seen placing his finger over the microphone at **5:17 (min:sec)** into the recording, muting all audio until **8:56**, for a total of **three minutes and thirty-nine seconds (3:39)** of suppressed audio.

51. Expert **Todd L. Mutchler**, a 38-year law enforcement veteran, reviewed the BWC footage and concluded that this act of audio obstruction was a **significant deviation from accepted national standards** governing police transparency, evidentiary integrity, and body-worn camera protocol.

52. According to Mr. Mutchler, the deputies' actions **violated the IACP Model Policy** on Body-Worn Cameras and the **Michigan Law Enforcement Accreditation Commission (MLEAC) Standard 3.5.5**, which prohibit the muting or obstruction of audio recordings unless a documented policy-based exception applies—and even then, only after a **verbal articulation of justification**, which was absent here.

53. Mr. Mutchler also concluded that the deputies' decision to forcibly enter Plaintiff's home—without a warrant, without consent, and in the absence of an emergency—**violated long-standing constitutional norms** under the **Fourth Amendment**, which holds warrantless home entries to be presumptively unreasonable.

54. No noises, visible injuries, evidence of distress, or other signs of danger were observed or reported by the deputies prior to entry. Plaintiff's communication through the doorbell camera constituted **compliance and non-confrontational conduct**, further negating any legitimate claim of exigency.

55. Expert Mutchler emphasized that **proper police training and national best practices** instruct officers in such circumstances to **isolate and contain the scene**, establish perimeter security if needed, and **seek a warrant through judicial channels** rather than create a self-generated emergency. By unlawfully entering Plaintiff's residence and detaining him inside his own home, the deputies subjected Plaintiff to an **unlawful search and seizure** without legal process, probable cause, or recognized exception under the Fourth Amendment.

56. Plaintiff was **searched and detained** by the deputies inside his residence—deprived of liberty and bodily autonomy—despite presenting no threat, violating no law in the deputies' presence, and receiving no Miranda warning, criminal charge, or explanation for the intrusion.

57. The muting of the audio during the encounter further served to **conceal potential misconduct**, destroy critical evidence, and impair Plaintiff's ability to contest the events with a full and accurate factual record. This act undermines the **fundamental due process rights** guaranteed by the **Fourteenth Amendment**.

58. The deputies' conduct, as described and analyzed in detail in the **Expert Report of Todd L. Mutchler** (Exhibit A), reveals not only **individual misconduct**, but also **systemic failures** in training, supervision, and

adherence to professional policing standards within the Oakland County Sheriff's Department.

59. Plaintiff suffered significant **emotional distress**, including fear, humiliation, anxiety, and a loss of personal security, as a result of Defendants' unlawful intrusion into his home and the violation of his fundamental rights.

60. Plaintiff also experienced **reputational harm**, injury to his standing in the community, and a deep loss of trust in law enforcement and government institutions.

61. At no point did the Defendants seek judicial authorization for their actions, articulate a legitimate legal basis for entry or detention, or document any emergency justifying warrantless conduct.

62. The actions taken by the Defendants were not only unconstitutional but **deliberate, knowing, and executed with reckless disregard** for Plaintiff's rights and for the requirements imposed by the U.S. Constitution, national accreditation standards, and their own departmental policies

### COUNT I – Unlawful Search and Seizure

### (42 U.S.C. § 1983 – Fourth Amendment Violation)

### Against All Individual Defendants in Their Individual Capacities

63. The within incorporates by reference any and all paragraphs previously.

64. The **Fourth Amendment to the United States Constitution**, applicable to the states through the **Fourteenth Amendment**, guarantees individuals the right to be free from **unreasonable searches and seizures** of their persons, homes, and property by government actors.

65. At all relevant times, it was clearly established that **a warrantless entry into a person's home is presumptively unreasonable** unless justified by a **recognized exception**, such as valid consent, exigent circumstances, or hot pursuit, none of which were present here.

66. On the night of **December 24 into the morning of December 25, 2023**, Defendants **Salyers, Alzayadi, Landersos**, and **John Does 1–3**, while acting under color of state law and within the scope of their employment as deputies of the **Oakland County Sheriff's Department, unlawfully entered Plaintiff's home without a warrant, consent, or lawful justification**.

67. The deputies were responding to a **domestic complaint** that had occurred **several hours earlier**, involving no ongoing emergency or threat. The scene was calm and secure, and Plaintiff had communicated with deputies via a video doorbell device in a **non-confrontational and peaceful manner**.

68. There were no exigent circumstances. There was **no evidence** of imminent danger, injury, or destruction of evidence. No sounds or visual indicators suggested that anyone inside the home required immediate aid or protection.

69. Despite this, Defendants **forcibly entered Plaintiff's home**, thereby committing a **warrantless and unlawful search** in violation of the Fourth Amendment.

70. Once inside, Defendants **detained, searched, and seized Plaintiff** without probable cause, legal justification, or the issuance of any criminal citation, warrant, or arrest order.

71. The **Expert Report of Todd L. Mutchler**, attached as Exhibit A and incorporated herein, concludes that the deputies' warrantless entry and seizure **"deviated significantly from nationally accepted police practices"** and were inconsistent with OCSD's obligations as an accredited law enforcement agency under MLEAC standards.

72. The report further states that **any reasonably trained officer** would have known that a warrantless entry in this context was unlawful, and that professional policing standards require containment of the scene and judicial authorization before entering a private residence.

73. In addition to the unlawful entry and seizure, Defendants intentionally **obstructed the audio recording functions of their body-worn cameras**

(BWCs) by placing their fingers over the microphones, effectively muting the recording for **3 minutes and 39 seconds**, as documented in the expert report and BWC metadata.

74. This obstruction was not authorized by department policy or accreditation standards. It was done intentionally to suppress contemporaneous evidence of their actions and communications, violating Plaintiff's **right to due process** and compounding the Fourth Amendment violation by concealing the conduct surrounding the unlawful entry.

75. Defendants acted jointly and in concert, and each knew or reasonably should have known that their actions violated Plaintiff's clearly established constitutional rights.

76. As a direct and proximate result of Defendants' unconstitutional acts, Plaintiff **suffered a loss of liberty**, invasion of privacy, emotional distress, trauma, and damage to his personal and professional reputation.

77. Plaintiff further suffered **substantial economic loss**, including the collapse of his **independent trucking business**, which he was unable to sustain following the reputational harm and emotional toll caused by the incident.

78. Defendants' conduct was intentional, malicious, and committed with deliberate indifference to Plaintiff's constitutional rights, entitling Plaintiff to **compensatory and punitive damages**.

79. Plaintiff further seeks **attorneys' fees and costs** pursuant to **42 U.S.C. § 1988**, and any other relief the Court deems just and proper.

## **COUNT II – Failure to Intervene**

### **(42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations) Against All Individual Defendants in Their Individual Capacities**

80. Plaintiff incorporates by reference Paragraphs 1 through 79 as though fully set forth herein.

81. At all relevant times, Defendants **Salyers, Alzayadi, Landersos, and John Does 1–3** were sworn deputies of the **Oakland County Sheriff's Department**, acting under color of state law and within the scope of their employment.

82. Each of the individual Defendants was required to adhere to the constitutional limitations imposed by the **Fourth and Fourteenth Amendments**, including the obligation not to violate the constitutional rights of individuals and the duty to prevent others from doing so.

83. Each Defendant was physically present during the events of **December 24–25, 2023**, and directly observed, participated in, or stood by during the unlawful and warrantless entry into Plaintiff's home.

84. Each Defendant also observed or reasonably should have observed the **unlawful detention, seizure, and search of Plaintiff**, despite the absence of probable cause, a warrant, consent, or exigent circumstances.

85. Each Defendant further observed, participated in, or had full awareness of the **intentional muting and obstruction of body-worn camera (BWC) audio recordings**, conducted by placing a finger over the BWC microphone to prevent the recording of critical contemporaneous audio.

86. It is well-established in the Sixth Circuit that a law enforcement officer has an **affirmative duty to intervene** to prevent a constitutional violation when the officer:

a. observes or has reason to know that another officer is committing a constitutional violation; and

b. has a realistic opportunity to intervene and prevent the harm.

87. The circumstances here provided **multiple and sustained opportunities** for intervention by each Defendant, including opportunities to:

a. stop or object to the warrantless entry;

b. warn fellow deputies that no legal justification existed for forced entry;

c. prevent the unlawful seizure and detention of Plaintiff; and

d. instruct or direct colleagues not to obstruct or mute BWC audio recording.

88. The conduct observed on the body-worn camera footage was so **egregious and plainly unlawful** that any objectively reasonable officer would have recognized the clear constitutional violations taking place.

89. According to the **Expert Report of Todd L. Mutchler**, a 38-year law enforcement veteran and former Director of Public Safety, the deputies' actions, including both the unlawful entry and the suppression of BWC audio were a **gross deviation** from nationally accepted law enforcement practices.

90. Mr. Mutchler further concluded that these deviations were so extreme that **any reasonably trained officer** would have known the actions were unlawful and would have understood that intervention was required.

91. Despite knowing of the constitutional violations, and despite having practical and realistic opportunities to intervene, **none of the individual Defendants took any steps** to stop, prevent, or mitigate the unlawful entry, unlawful detention, or suppression of BWC audio.

92. Defendants likewise failed to report the misconduct after the fact, further demonstrating their complicity and deliberate indifference to Plaintiff's constitutional rights.

93. The failure to intervene by each Defendant directly and proximately caused the continuation and escalation of the constitutional violations perpetrated against Plaintiff.

94. As a direct and foreseeable result, Plaintiff suffered:

   a. an unlawful and traumatic home invasion;

   b. illegal detention and deprivation of liberty;

   c. destruction and suppression of critical audio-evidence;

   d. emotional distress, humiliation, and psychological trauma;

   e. reputational harm and community stigmatization; and

   f. severe and catastrophic economic loss, including the total collapse of his trucking business.

95. Each Defendant is therefore **fully liable under 42 U.S.C. § 1983** for failing to intervene to prevent violations of Plaintiff's Fourth and Fourteenth Amendment rights.

96. Plaintiff seeks **compensatory damages, special damages, economic damages**, and **punitive damages** against all individual Defendants, along with **attorneys' fees and costs** under **42 U.S.C. § 1988**, and all other relief this Court deems just and proper.

**<u>COUNT III – Violation of Due Process</u>**

**(42 U.S.C. § 1983 – Fourteenth Amendment Violation)**

**Against All Individual Defendants in Their Individual Capacities**

97. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 96 as though fully set forth herein.

98. The **Fourteenth Amendment to the United States Constitution** provides that no state shall "deprive any person of life, liberty, or property, without due process of law." This guarantee includes both procedural and substantive protections.

99. At all relevant times, the actions of the Defendants, including **Salyers, Alzayadi, Landersos**, and **John Does 1–3**, were undertaken under color of state law and within the course and scope of their employment as deputies of the **Oakland County Sheriff's Department**.

100. On the night of **December 24–25, 2023**, Defendants knowingly and deliberately **muted or obstructed the audio recording function** on their department-issued **body-worn cameras (BWCs)** during a critical public encounter involving the forced entry into Plaintiff's home and the unlawful seizure of his person.

101. Specifically, as documented in the **Expert Report of Todd L. Mutchler**, one deputy muted the microphone of his BWC for **3 minutes and 39**

**seconds**, during a time when critical communications and interactions were occurring.

102. The **intentional suppression of contemporaneous audio evidence** was done without legal justification, without any valid policy-based exception, and in direct violation of national and departmental standards governing the use of body-worn cameras, including policies promulgated by the **Michigan Law Enforcement Accreditation Commission (MLEAC)** and the **International Association of Chiefs of Police (IACP).**

103. At no point did any Defendant provide a verbal justification for the muting or obstruction of audio, as required by best practices and agency policy. Instead, the suppression was **done in concert, deliberately, and for the purpose of avoiding accountability** for their unconstitutional conduct.

104. As a result of this audio suppression, Plaintiff was **deprived of objective, contemporaneous, exculpatory evidence** necessary to preserve his rights, defend his reputation, and seek redress for the constitutional violations committed against him.

105. The absence of this evidence has materially impacted Plaintiff's ability to protect his legal interests, present accurate factual accounts, and contest any adverse presumptions or narratives that may have arisen from the incident.

106. Defendants' conduct constitutes a **violation of Plaintiff's procedural due process rights**, as guaranteed by the Fourteenth Amendment, by **undermining the integrity and fairness of any investigative or judicial process** related to the incident.

107. Defendants' conduct was **arbitrary, conscience-shocking**, and executed with **deliberate indifference** to Plaintiff's constitutionally protected rights, and was not justified by any compelling or legitimate governmental interest.

108. The use of body-worn cameras is specifically intended to ensure **transparency, accountability, and protection** of both civilians and law enforcement officers. The suppression of such recordings represents a **gross abuse of public trust and a denial of Plaintiff's access to critical documentary evidence.**

109. As a direct and proximate result of Defendants' unconstitutional actions, Plaintiff suffered:

a. **Violation of his right to due process** under the Fourteenth Amendment;

b. **Emotional distress and trauma** caused by the inability to prove or disprove key facts surrounding the home entry and seizure;

c. **Long-term reputational damage**, including being falsely implicated in criminal conduct; and

d. **Loss of his livelihood**, including the destruction of his independent

**trucking business,** due to reputational fallout and emotional instability resulting from the incident.

110. The actions of the Defendants were intentional, malicious, or, at a minimum, undertaken with reckless disregard for Plaintiff's constitutional rights.

111. Plaintiff is entitled to **compensatory damages** for the harms suffered, as well as **punitive damages** against the individual Defendants to punish and deter such misconduct in the future.

112. Plaintiff further seeks **attorneys' fees and costs** pursuant to **42 U.S.C. § 1988**, and all other relief the Court deems just and proper.

## <u>COUNT IV – Municipal Liability (Monell Claim)</u>

**(42 U.S.C. § 1983 – Fourth and Fourteenth Amendments)**

**Against Defendants Oakland County and the Oakland County Sheriff's Department**

113. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 112 as though fully set forth herein.

114. Defendants **Oakland County** and the **Oakland County Sheriff's Department (OCSD)** are governmental entities organized under the laws of

the State of Michigan and are "persons" within the meaning of **42 U.S.C. § 1983**.

115. As municipal entities, Oakland County and OCSD are responsible for establishing policies, procedures, customs, and practices that govern the conduct, training, supervision, and discipline of deputies and law enforcement personnel under their authority.

116. Under **Monell v. Department of Social Services**, 436 U.S. 658 (1978), a municipality may be held liable under § 1983 where an official policy, custom, or practice is the "moving force" behind a constitutional violation.

117. At all relevant times, **Oakland County and OCSD maintained and enforced unconstitutional policies, customs, and practices**—or deliberately failed to adopt necessary policies—which directly caused the violations of Plaintiff's Fourth and Fourteenth Amendment rights.

118. These unconstitutional customs and failures included, but were not limited to:

a. **Failure to properly train and supervise deputies** on the constitutional limitations of warrantless entry into a private residence, including the need for a valid warrant, consent, or the presence of exigent circumstances;

b. **Toleration or deliberate indifference to the improper muting or obstruction of body-worn camera (BWC) recordings,** particularly during constitutionally sensitive operations such as home entry and seizure;

c. **Failure to enforce or implement policies requiring deputies to record and preserve all interactions with the public,** including contemporaneous audio, as mandated by best practices and national accreditation standards (e.g., MLEAC and IACP);

d. **A pattern and practice of failing to investigate, discipline, or retrain deputies involved in prior complaints of unlawful entry, excessive force, evidentiary misconduct, or body-worn camera tampering;** and

e. **A departmental culture that encouraged or permitted silence and non-intervention** among deputies during incidents of known constitutional misconduct.

119. These systemic deficiencies amounted to a **policy of deliberate indifference** to the constitutional rights of individuals such as Plaintiff, and they were causally linked to the violations alleged in this case.

120. The conduct of the individual deputies—unlawful entry, unlawful detention, suppression of audio, and failure to intervene—was not the result of isolated errors or rogue behavior. Rather, it was the **predictable and**

**foreseeable outcome of institutional failures** that OCSD and Oakland County had the power and obligation to correct.

121. The **Expert Report of Todd L. Mutchler** supports the conclusion that the deputies' actions were not only constitutionally deficient, but also represented **deviations from well-established professional standards**, indicating a lack of institutional training, supervision, and accountability within OCSD.

122. Defendants Oakland County and OCSD either **explicitly adopted these unconstitutional policies**, or **allowed them to persist through official inaction**, thereby making them policies of the municipality under Monell.

123. As a direct and proximate result of these unconstitutional customs and practices, Plaintiff's rights under the **Fourth and Fourteenth Amendments** were violated, causing him to suffer:

a. The unlawful entry and invasion of his home;

b. The illegal seizure and detention of his person;

c. The destruction and suppression of objective audio evidence;

d. Emotional trauma and psychological harm;

e. Damage to his reputation and standing in the community; and

f. Significant economic loss, including the total collapse of his trucking business.

124. Plaintiff is therefore entitled to recover compensatory damages from **Oakland County and the Oakland County Sheriff's Department** for the injuries proximately caused by their policies, customs, and failures to act.

125. Plaintiff further seeks **attorneys' fees and costs** under **42 U.S.C. § 1988**, along with all other relief this Court deems just and proper.

### COUNT V – Supervisory Liability for Constitutional Violations

**(42 U.S.C. § 1983 – Failure to Supervise, Train, or Intervene)**

**Against Senior OCSD Supervisors and Supervisory John Does**

126. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 125 as though fully set forth herein.

127. At all relevant times, one or more **supervisory personnel** within the Oakland County Sheriff's Department, including but not limited to supervising sergeants, lieutenants, shift commanders, and **Supervisory John Does 1–3** were responsible for overseeing the conduct of Defendants Salyers, Alzayadi, Landersos, and the other deputies involved in the incident on December 24–25, 2023.

128. Supervisory defendants acted under color of state law and within the scope of their duties, with the authority and responsibility to supervise,

direct, correct, and discipline deputies during and after law enforcement encounters.

129. Under clearly established § 1983 jurisprudence, supervisors may be held liable for constitutional violations committed by subordinates when the supervisor:

a. **actively participated** in the unconstitutional conduct;

b. **authorized, approved, or knowingly acquiesced** in the unconstitutional conduct; or

c. **failed to supervise, train, or intervene**, and such failure amounted to deliberate indifference to the rights of persons with whom the deputies came into contact.

130. Supervisory personnel had direct or constructive knowledge of the deputies' unconstitutional conduct, including the warrantless home entry, unlawful detention, improper audio suppression on body-worn cameras, and the failure of deputies to intervene in each other's misconduct.

131. Supervisory defendants were either **present on scene**, monitoring or directing deputies through communication channels, or **were aware of deputies' conduct through real-time reporting,** yet failed to take reasonable steps to intervene, stop, correct, or countermand the unlawful actions.

132. Further, upon information and belief, supervisory personnel **failed to conduct any meaningful review, investigation, or disciplinary action** after the incident, despite the clear indications of constitutional violations evident on body-worn camera footage.

133. The **Expert Report of Todd L. Mutchler** emphasizes that the deputies' violations were so severe, obvious, and contrary to national policing standards that any competent supervisor would have recognized the conduct as unlawful and in need of immediate correction.

134. The supervisory failures that contributed to Plaintiff's injuries include, but are not limited to:

a. failure to intervene during the unconstitutional home entry and detention;

b. failure to direct deputies to comply with body-worn camera policies;

c. failure to stop or correct the intentional muting of audio evidence;

d. failure to properly monitor the actions of deputies responding to domestic complaints;

e. failure to ensure deputies were trained on constitutional limits to home entry and seizure; and

f. failure to provide corrective action, retraining, or discipline for deputies with known histories or risk factors for constitutional violations.

135. These supervisory failures were not isolated incidents but reflected a **pattern of inadequate oversight** within the OCSD, thereby demonstrating **deliberate indifference** to the constitutional rights of individuals, including Plaintiff.

136. Had supervisory personnel properly trained, supervised, or intervened during the events of December 24–25, 2023, the warrantless entry, unlawful seizure, and suppression of audio evidence **would have been prevented or mitigated**.

137. As a direct and proximate result of the supervisory failures described herein, Plaintiff suffered:

a. the violation of his Fourth and Fourteenth Amendment rights;

b. emotional distress, fear, and humiliation;

c. reputational harm; and

d. severe economic loss, including the collapse of his trucking business and loss of livelihood.

138. Supervisory Defendants are therefore liable under **42 U.S.C. § 1983** for their own actions and omissions, which directly contributed to the constitutional violations inflicted upon Plaintiff.

139. Plaintiff is entitled to **compensatory damages, punitive damages** against supervisory defendants in their individual capacities, and **attorneys' fees and costs** pursuant to **42 U.S.C. § 1988**.

140. Plaintiff further seeks all additional relief the Court deems just and proper.

WHEREFORE, Plaintiff Eric Bouie, through his attorneys, respectfully requests that this Honorable Court grant the following relief:

1. **Enter judgment in favor of Plaintiff and against all individual Defendants**, including Defendants Salyers, Alzayadi, Landersos, and John Does 1–3 in their individual capacities, for violations of Plaintiff's clearly established rights under the **Fourth and Fourteenth Amendments** to the United States Constitution, pursuant to **42 U.S.C. § 1983**;

2. **Enter judgment against Defendants Oakland County and the Oakland County Sheriff's Department**, pursuant to **Monell v. Department of Social Services**, 436 U.S. 658 (1978), for maintaining customs, policies, and deliberate indifference that were the **moving force behind the constitutional violations** committed against Plaintiff;

3. **Enter judgment against supervisory Defendants**, including **Supervisory John Does**, for failing to train, supervise, intervene, or discipline subordinate officers in a manner consistent with constitutional mandates and professional law enforcement standards;

4. **Award Plaintiff full compensatory damages** in an amount to be determined at trial, for the physical invasion of his home, the unlawful detention of his person, the emotional trauma and distress he endured, the reputational stigma caused by Defendants' conduct, and the complete destruction of Plaintiff's independent trucking business;

5. **Award punitive damages** against the individual Defendants, in their individual capacities, for conduct that was **intentional, willful, malicious, oppressive, or carried out with reckless disregard** for Plaintiff's federally protected rights;

6. **Award economic damages**, including but not limited to lost income, lost business profits, lost future earning capacity, and other consequential damages stemming directly from Defendants' actions and the resulting collapse of Plaintiff's livelihood;

7. **Award reasonable attorneys' fees, costs of suit, and litigation expenses** under **42 U.S.C. § 1988** and any other applicable law;

8. **Grant appropriate declaratory or injunctive relief**, including but not limited to declaratory findings that the conduct of Defendants violated clearly established constitutional rights, and appropriate measures to prevent recurrence of such misconduct in the future;

9. **Retain jurisdiction** over this action to ensure full compliance with any orders issued;

10. And grant such **other and further relief** as this Court may deem **just, proper, and equitable under the circumstances.**

Respectfully Submitted,

*Kama Patel*

_____

Kama Patel, Esq. (P62237)

Attorney for Plaintiff

Kama.anaadhi@gmail.com

734-377-6233

"A"

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**Eric Lee Bouie**

*Plaintiff*

CASE NO. 2-25-cv-10132-LVP-EAS

vs

## DEPUTY SHERIFF AHMED ALZAYADI
## DEPUTY SHERIFF JORGE LANDERON
## OAKLAND COUNTY SHERIFF's DEPARTMENT

*Defendants*

Expert Report of Todd L. Mutchler
November 16, 2025

## INTRODUCTION

I, Todd L. Mutchler have been retained by Attorney Kama Patel to provide expert analysis and testimony in the case involving Oakland County Michigan Sheriff Deputies Alzayadi and Landeron. My role in this case is to assess the actions taken by law enforcement officials and provide an expert opinion regarding their actions as they relate to standard police practices, training and general law enforcement policies and procedures.

I have reached conclusions on this issue:

As a result of my review of the four body worn video's provided to me related to the encounter Deputies from the Oakland County Sheriff's Department had with Plaintiff, Eric Bouie on Christmas Eve, December 24, 2023 just before midnight at his residence, I conclude to a reasonable degree of professional certainty that the actions taken to obscure the audio recording on two different body-worn cameras and the search and seizure of the Plaintiff at his home early on Christmas morning deviated from generally accepted police practices and training, as explained further below.

**SUMMARY OF FACTS RELATING TO THE UNDERLYING CRIMINAL CASE:**

On Sunday, December 24, 2023 (Christmas Eve) at approximately 11:30 p.m., Deputy Sheriff's responded to meet with Desiree McCullough, Mother to two children of Plaintiff Bouie regarding a domestic violence dispute which occurred earlier in the evening. McCullough tells the deputies that she was at Bouie's Mother's home, where he stays, doing a child exchange. The video recording captures her statement that Plaintiff Bouie pulled a knife out and put it to her face. Deputies also took a statement from Ms. McCullough's cousin, Juanita Ball as well. Ball indicated she listened to the argument and heard Bouie threaten McCullough several times over the course of about 15 minutes.

Deputies went from taking the report from McCullough to Plaintiff's residence arriving one minute before midnight. They make several attempts to get a response at the door including ringing the doorbell and knocking on the door.

EDUCATION:

I hold a Bachelor of Science from Eastern Michigan University in Criminal Justice/Criminology; a Master of Liberal Studies from Eastern Michigan University. I am a Graduate of both the Eastern Michigan University School of Police Staff and Command as well as the Federal Bureau of Investigation National Academy (FBINA). I am also a Fellow of the Michigan State University Michigan Political Leadership Program and received certification through Saginaw Valley State University as a Public Manager.

EXPERIENCE:

With 38 years of law enforcement experience, I have vast knowledge and deep understanding of law enforcement operations; two years working in dispatch and 36 years as a sworn law enforcement officer with four different police departments. My professional career included nine years working general patrols on a college campus, a city and a township in southeast Michigan. I was selected to serve as a Field Training Officer, A Police Bicycle Officer, and A Special Weapons and Tactics (SWAT) Officer. Additionally, I've instructed various law enforcement topics in the classroom including Basic SWAT, Less- Lethal Weapons, Police Alcohol Enforcement and Police Leadership, Management and Supervision Courses at the University level including Citizen Complaint and Disciplinary Process and Professional Development.

I have received thousands of hours of specialized training including SWAT, Police Alcohol Enforcement, Use of Force, Supervisory, Management and Leadership Courses.

Throughout the course of my law enforcement career, I have investigated thousands of cases; made hundreds of arrests resulting in criminal prosecution. I have supervised investigations culminating in warrant requests and prosecution.

As a recently retired Director of Public Safety of 10 years from two different departments, I have initiated, reviewed and approved hundreds of policies and procedures relating to every aspect of law enforcement including rules of conduct, report writing, use of force, emergency vehicle operations, police operations, case investigations, and citizen complaints. I have overseen two agencies during the Commission on Accreditation for Law Enforcement Agencies accreditation process as well as the first agency to apply for Certification from the Michigan Association of Chief's of Police (MACP). Northville Township held the distinction of only a few agencies in the State of Michigan with dual accreditation.

I've held membership in various chiefs' organizations including the Wayne County Chief's of Police, Southeast Michigan Association of Chief's of Police, Michigan Association of Chief's of Police (MACP). Served on the MACP Legislative Committee, the last 3 years as Chairman testifying before both Senate and House committees.

In my roles as a Field Training Officer, Sergeant (Supervisor), Lieutenant (Manager) and Director (Administrator), I have extensive and broad-based experience reviewing and evaluating officer performance as it related to department standards, policies and procedures, Michigan statutes and the United States Constitution.

Of specific relevance to this case:

- I have supervised hundreds of officers during my career and have reviewed their compliance with agency policies relating to traffic stops, investigative detentions, arrests, vehicular pursuits, traffic homicide investigations, criminal investigations, and uses of force, both as a supervisor and later in command and executive management positions. I have reviewed hundreds of internal investigations involving allegations of violations of agency policy.

- I have extensive supervisory, management, administrative, investigative, and operational experience in law enforcement, supplemented by practical, and formal education, and specialized training in law enforcement. I have received thousands of hours of specialized and professional training in nearly all areas of law enforcement including particular emphasis in alcohol enforcement investigations, arrests, use of force, and policies and procedures. I have also been involved and responsible for the development and updating of police policies and procedures for over 20 years during my law enforcement career.

- I taught hundreds of police officers at the Schoolcraft College basic Police Academy.

4

- I have supervised the investigation and arrest of drunk drivers.

This background enables me to explain training protocols, standards, and best practices, providing essential context for understanding the actions of law enforcement officers in specific situations.

More specifically as it relates to:

Policy and Procedures:

• Development and Implementation - Actively involved in developing department policies and procedures for over two decades. - Ensured proper implementation of these policies across the department.

• Compliance Review - Conducted reviews of subordinate performance to ensure compliance with department policies, legal standards, and accepted guidelines.

 • Accreditation- Policy and Procedures - Nearly 20 years of experience working in CALEA-accredited agencies, recognized for implementing "best practices" in law enforcement. - Played a crucial role in creating and implementing policies to meet the highest industry standards.  This expertise allows me to provide informed opinions on whether officers adhered to established police protocols and best practice standards during their actions. These insights are crucial for assessing compliance with legal and departmental guidelines.

Management and Supervision:

• Leadership Experience - Over 26 years of supervisory roles, progressing from supervisor, lieutenant, and Director of Public Safety. - Proven leadership in managing training units, enforcing departmental policies, and overseeing police department operations.
Complaint and Misconduct Investigations - Throughout my 38-year career, I have reviewed and investigated hundreds of internal allegations of police misconduct. - As Director of Public Safety, I was responsible for assessing the validity of these complaints, applying corrective actions when necessary, and maintaining public trust. My experience ensures a thorough understanding of internal investigations and the critical importance of adhering to policies, procedures, and the rule of law. This background allows me to provide authoritative insights into leadership, supervision, and organizational culture within law enforcement agencies. These perspectives are essential for evaluating the actions of officers.

My leadership, strategic thinking, and dedication to public safety have earned me many awards throughout my career including, MADD (drunk driving enforcement), Department Citation, Special Unit Participation, Certificate of Merit, Physical Fitness, Unit Commendation, Leadership Award, Safe Driving Award, Officer of the Year, Exemplary Conduct Academic Achievement, recognition

from the Michigan Department of Civil Rights and International Association of Chief's of Police for work on Hate Crime Coalition among others.

With over 38 years of experience managing and supervising every aspect of police department operations, my expertise is well-documented. For further details on my training, qualifications, and background, please refer to my Curriculum Vitae, attached to this report as Exhibit C.

Although I have not authored any publications in the previous 10 years, or testified as an expert in a civil case, with over 38 years of experience managing and supervising every aspect of police department operations, my expertise is well-documented. For further details on my training, qualifications, and background, please refer to my Curriculum Vitae, attached to this report as Exhibit A. Retainer & Fee Schedule: Retainer - $2,000.00 Case Review and Expert Report - $250.00/hr. Deposition Testimony – $300.00/hr. Trial Testimony – $3,000.00/day

My role in presenting this report and any subsequent depositions and trial testimony is to assist the trier of facts in reaching its conclusions. Any opinions expressed herein are held to a reasonable degree of professional certainty. The information that I relied on consists of the information reasonably relied upon in my field of expertise.

All my opinions are rendered to a reasonable degree of professional certainty in the field of police practices, law enforcement training, administration, and discipline based on my education, training, and employment as a law enforcement officer, as well as my work as a law enforcement trainer, and my experience as a consultant in the field.

## METHODOLOGY USED TO EVALUATE:

The method I used in reaching my conclusions included a review of materials provided by the Plaintiffs' counsel and vetted against what I have come to know through my years of specialized education, training, and experience as generally accepted practices in the field of law enforcement. These standards have also been established in model policies promulgated by professional organizations such as the International Association of Chiefs of Police (IACP)[1], and the Commission on Accreditation for Law Enforcement (CALEA)[2] and Michigan Law Enforcement Accreditation

---

[1] IACP- The International Association of Chiefs of Police (IACP) is the world's largest and most influential professional association for police leaders. With more than 32,000 members in over 170 countries, the IACP is a recognized leader in global policing, committed to advancing safer communities through thoughtful, progressive police leadership. Since 1893, the association has been serving communities by speaking out on behalf of law enforcement and advancing leadership and professionalism in policing worldwide.

[2] CALEA- The Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA®), was created in 1979 as a credentialing authority through the joint efforts of law enforcement's major executive associations: International Association of Chiefs of Police (IACP), National Organization of Black Law Enforcement Executives (NOBLE), National Sheriffs' Association (NSA), Police Executive Research Forum (PERF). The CALEA Accreditation programs provide public safety agencies with an opportunity to voluntarily meet an established set of professional standards, which require: Comprehensive and uniform written directives that clearly define authority, performance, and responsibilities Reports and analyses to make fact-based and informed management

Commission (MLEAC).[3] Lastly, these practices have been vetted through our courts as evidenced by innumerable United States Supreme Court decisions.

The IACP Center publishes Model Policies and Concepts and Issues Papers to provide guidelines, essential background material, and supporting documentation to law enforcement agencies and officers, to provide a greater understanding of the developmental philosophy and implementation requirements for the model policies. Reasonable law enforcement agencies and officers recognize that the Center makes every effort to ensure these papers and model policies incorporate the most current information and contemporary professional judgment on this issue. The Center published Model Policy and Concepts and Issues Papers on the following issues. This list contains all materials I relied upon for the formulation of my opinions. I referred to these documents during my analysis of this case:

1. International Association of Chiefs of Police (IACP) Search Warrants Model Policy
2. International Association of Chiefs of Police Body-Worn Camera's Model Policy


The MLEAC puts forward recognized professional standards, specifically for law enforcement agencies within the State of Michigan. Accredited agencies are required to demonstrate compliance with program requirements. As Oakland County Sheriff's Department is currently an accredited agency in the state, I referred to this document during my analysis of this case:

1. Michigan Law Enforcement Accreditation Commission Standards Manual

I also reviewed the following body-worn video footage:

2. Motorola Solutions Body-Worn camera BWC2-093248 (bouiewitnessstatement)
3. Motorola Solutions Body-Worn camera BWC2-093157 (BouieBC)
4. Motorola Solutions Body-Worn camera BWC2-093248
5. Motorola Solutions Body-Worn camera BWC2-089213

There is a substantial body of knowledge and literature about the practices and standards that modern, reasonably managed, and administered police agencies across the United States should follow and apply to their operations. These generally accepted practices have developed over time to encourage and assist police agencies in delivering police services to communities serviced which are professional, reasonable, effective, and legal. Many of these generally accepted practices have been

---

decisions. Preparedness to address natural or man-made critical incidents, Community relationship-building and maintenance, and independent review by subject matter experts. Continuous pursuit of excellence through annual reviews and other assessment measures. 3

[3] Accreditation is a progressive and time-proven way of helping law enforcement agencies calculate and improve their overall performance. The foundation of Accreditation lies in the adoption of standards containing a clear statement of professional objectives. Participating agencies conduct a thorough self- analysis to determine how existing operations can be adapted to meet these objectives. When the procedures are in place, a team of trained assessors verifies that applicable standards have been successfully implemented.

developed from law enforcement's critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies, and employee misconduct. Opinions that I present in this report may use terminology that resembles legal terms or standards. The use of specific/similar legal terminology is not intended to draw legal conclusions, subvert the function of the court, or inappropriately influence triers of the fact. The use of certain terms such as "reasonable", "reckless", "negligent", "unreasonable", and "foreseeable" are commonly used in my field of expertise, I used them often as a Police Chief, and when I train or communicate with law enforcement officers. These terms and others form the basis of my understanding of the subject matter and are commonly used by law enforcement officials in the field. I do not offer legal opinions, and my conclusions are based strictly on law enforcement training and accepted standards, not on interpretations of the law.

My analysis and report avoid determining the credibility of the various parties and witnesses, or choosing between disputed accounts, as that is outside the purview of my work and remains within the province of the fact finder. My opinions and the facts upon which I base my opinions are discussed in greater detail below. Of course, if any new material is provided to me related to this matter, or my opinions set forth here, I will consider it. I, therefore, reserve the right to alter my opinions and/or form additional opinions regarding this case upon disclosure to me of further information or documentation related to this case.

Although I have not authored any publications in the previous 10 years, or testified as an expert in a civil case in the last four years, with over 38 years of experience managing and supervising every aspect of police department operations, my expertise is well-documented. For further details on my training, qualifications, and background, please refer to my Curriculum Vitae, attached to this report as Exhibit A. Retainer & Fee Schedule: Retainer - $2,000.00 Case Review and Expert Report - $250.00/hr. Deposition Testimony – $300.00/hr. Trial Testimony – $3,000.00/day

Additionally, my opinions are provided to educate the jury on generally accepted police practices and procedures. They are interspersed throughout this report and extend beyond the explicitly identified opinions. . My qualifications are summarized in greater detail in my curriculum vitae, which is attached to this report. A list of my court and deposition testimony in the last four years is attached to this report. I am being compensated for my time at the rate of $350.00 per hour. My compensation is not contingent on the outcome of this litigation nor on the opinions I express in this report or subsequent court testimony. Attachments to this report include the following:


**Attachments to this report include the following**:

Attachment A – Retainer and Fee Scheule

Attachment B - List of material reviewed.

Attachment C - Complete and detailed curriculum vitae.

8

## PROFESSIONAL OPINIONS AND BASIS FOR OPINIONS:

**OPINION #1: Based on my review of the body-worn camera recordings and accepted police practices, the deputies' intentional act of covering the microphone on their body-worn cameras constitutes a significant departure from generally accepted standards of police documentation, transparency, and evidentiary integrity. This conduct is inconsistent with nationally recognized guidance, accreditation standards, and the training officers receive on the proper use of body-worn recording systems.**

**ANALYSIS**: Body-worn camera systems are designed to capture a complete audio and visual account of police–citizen interactions. In contemporary policing, accurate, unaltered recordings are considered an essential component of professional practice because they preserve evidence, maintain transparency, and help ensure accountability. Accredited agencies, such as the Oakland County Sheriff's Office, are required to adopt policies that direct officers to keep both audio and video recording unless a recognized and documented exception applies.

The recordings in this case show deputies placing a finger over the body-worn camera microphone for extended periods, including a documented interval of approximately **3 minutes and 39 seconds**. Based on nationally recognized standards—such as the IACP Model Policy on Body-Worn Cameras and MLEAC Standard 3.5.5—officers are trained that intentional muting or obstruction of a recording device is prohibited unless a specific, policy-authorized exception applies, and even then, officers are expected to verbally articulate the reason before doing so.

In my professional experience supervising officers and reviewing thousands of recordings, intentional obstruction of a camera microphone is widely understood to compromise the evidentiary value of the recording, remove critical contemporaneous information, and violate agency expectations for accurate documentation. No circumstances on the recorded footage suggest the deputies were operating under a policy exception that would justify muting or obstructing the audio. For these reasons, the officers' actions represent a clear deviation from accepted standards of police conduct, documentation, and evidentiary integrity.

Body-worn camera video captures deputies engaged in a conversation, first with someone who identifies herself as the Plaintiff's mother and then conversation through a "Ring" type doorbell which allows two-way communication between someone inside the house with people outside the door. Two different deputies are observed placing a finger over the camera/microphone effectively muting the audio recording. The deputy wearing camera identified as BWC2-093248 walks away from the door and suggests to another deputy to keep talking. He then places a finger blocking the microphone recording audio at 5:17 (min/sec) into the recording, muting any audio recording until 8:56 (min/sec); a full three minutes and 39 seconds (3:39).

9



MLEAC "<u>Field Activities</u>" Standards 3.5.5 *Mobile Video Recorders* (Body-Worn Cameras) requires the accredited agencies to have a written directive (Policy) *establishing guidelines for the use of mobile electronic recording systems, including body-worn cameras, in the field to minimally include*:

    a.   *Types of incidents to record;*
    b.   *Officer responsibilities; Supervisory responsibilities;*
    c.   *Procedures to preserve recordings of evidentiary value;*
    d.   *and Storage and retention of recordings.*

*Clarification Statement: Electronic recording systems include video and audio recording systems. Such systems may be vehicle mounted or systems carried by officers. Field personnel need direction when using mobile electronic recording system. Electronic recordings are invaluable in providing real-time documentation of events. When such recordings have evidential value, they shall be handled in accordance with applicable evidence standards.*[4]

Additionally, the IACP Model Policy recommends agencies develop clear policies regarding the use of body worn cameras; particularly to allow for *additional documentation of police-public contacts, arrests, and critical incidents; Serving as a means to enhance officer accountability; Enhancing an agency's ability to review probable cause for arrest; officer and suspect interaction; evidence for investigative and prosecutorial purposes; and to provide additional information for officer training;*

---

[4] ibid

*and Providing supplemental documentation of crime and accident scenes. This document is intended to provide agencies with items for consideration when developing their policies related to when and how officers should use body-worn cameras (BWCs) so that they may record their contacts with the public in accordance with legal requirements.*[5]

When deputies place their finger over the microphone, muting the audio recording it is done with the intent to deprive reviewers of hearing either what they are saying or what is being said in the immediate vicinity. This intentional act is a significant deviation from both national standards and requirements under accreditation standards. Officer's are trained to turn off recordings in certain circumstances such as entering areas such as a rest room or locker room, during strip searches, recordings that may capture undercover personnel, private homes among others.

**OPINION #2: Based on nationally recognized investigative standards and the training officers receive on warrantless entries, the deputies' decision to forcibly enter the residence did not align with accepted police practices. The scene was stable, there were no indicators that officers are trained to interpret as immediate threats to safety, and the circumstances did not present the conditions officers are taught to recognize as requiring immediate entry. Under accepted practice, officers should have maintained containment and sought judicial authorization rather than forcing entry.**

**ANALYSIS:** Law enforcement officers receive regular training on the limited situations in which warrantless entry may be appropriate. This instruction typically emphasizes that warrantless home entry is a serious action that should occur only when specific emergency conditions exist. Professional standards, including those described in IACP guidance and MLEAC accreditation requirements, direct officers to assess whether the situation presents:

- an immediate threat to life or safety,
- a risk of imminent destruction of evidence,
- a true emergency requiring immediate intervention, or
- circumstances involving hot pursuit.

In my review of the recordings, none of the indicators that officers are trained to recognize as emergent were present. The deputies had time, space, and the ability to maintain a secure perimeter. The person inside the residence was communicating through a doorbell camera system, which allowed deputies to monitor the situation without escalating it. There was no evidence of a disturbance, no sounds suggesting danger, and no statements by officers indicating concern that anyone inside was at risk of immediate harm.

---

[5] IACP Body Worn Camera Model Policy

Under generally accepted police practice, when officers have a known address, the scene is calm, and they are not responding to an ongoing emergency, they are expected to stabilize the situation and seek a search or arrest warrant before entering a private residence. Forcing entry in a non-emergency situation contradicts basic training and practice guidelines that emphasize containment and judicial authorization.

Additionally, coupling the decision to force entry with the earlier obstruction of body-worn camera audio reflects a pattern inconsistent with the standards of professional, well-documented, and accountable policing. In my experience as a supervisor and administrator, such decisions are inconsistent with the conduct expected of well-trained officers and accredited agencies.

As an Accredited agency, the OCSD would be required to receive training in warrantless searches including the following: *Consent searches; Stop and frisk; Search incident to arrest; Motor vehicle searches with probable cause and an exigency; Crime scene searches; Exigent circumstances, community caretaking, or emergency aid doctrine; Inventories of seized vehicles or other property; Plain view, plain touch, and plain smell; Open fields; and Other situations authorized by state and federal criminal procedure. Clarification Statement: The Michigan State Constitution and United States Constitution provide its citizens with Constitutional protections. Agencies should be careful to account for differences between U.S. and Michigan Supreme Court interpretations. Other situations can include, but are not limited to: abandonment, search incidental to arrest, canine sniffs, etc.*[6]

According to the MLEAC Accreditation Manual section 3.1.1"Warrantless Searches" requires the accredited agency to have a written directive establishing criteria for warrantless searches in accordance with contemporary criminal procedures. *Minimally, the written directive shall address:*

> *a. Types of incidents to record;*
> *b. Officer responsibilities;*
> *c. Supervisory responsibilities;*
> *d. Procedures to preserve recordings of evidentiary value; and*
> *e. Storage and retention of recordings.*[7]

The deputy's decision to cover the body-worn camera microphone, combined with the choice to forcibly enter the residence without first obtaining a search warrant, constitutes a significant departure from nationally accepted police standards and constitutional policing practices. Body-worn cameras are intended to capture a complete and contemporaneous record of police actions; intentionally obstructing the microphone removes critical evidentiary context and undermines transparency, accountability, and the integrity of the investigation. In addition, officers are trained to

---

[6]
https://cdn.ymaws.com/www.michiganpolicechiefs.org/resource/resmgr/accreditation/MLEAC_Standards_4.0_-_Revise.pdf
[7] MLEAC Standards Manual

12

understand that warrantless entry into a home is presumptively unreasonable under the Fourth Amendment, and professional guidance from the IACP and MLEAC requires officers to articulate a clear, immediate, and objectively verifiable exigency before breaching a residence. In this incident, the circumstances presented no identifiable threat of harm, no hot pursuit, no imminent destruction of evidence, and no emergency requiring sudden entry. Under accepted police practices, officers are required to stabilize the situation, isolate and contain the scene, and seek judicial authorization rather than creating a self-generated sense of urgency. These actions, taken together, reflect a deviation from established protocols and nationally recognized standards of professional law enforcement conduct.

**CONCLUSION:**

I have provided my opinions based on my training, experience, and my review of records in this case. I applied generally accepted police management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty and based on longstanding and well-accepted law enforcement practices. If additional information is presented to me, I am happy to consider it. I reserve the right to supplement or modify this report and my opinions expressed in the report. To the best of my knowledge, the information and accompanying documents I have provided to the Court are truthful and accurate.

/s/ Todd L.Mutchler

*Todd L. Mutchler*

13

# EXHIBIT A

# Todd L. Mutchler Municipal Operations, Criminal Justice & Expert Witness Solutions LLC.

## CONSULTANT/EXPERT FEE AND RETAINER AGREEMENT

**Consultant:** Todd L. Mutchler

## Contracted Attorney:

Re:   _____

This Fee Schedule and Retainer Agreement will apply to all consulting work provided by Todd L. Mutchler Municipal Operations, Criminal Justice & Expert Witness Solutions LLC.

## CASE REVIEW AND OPINION

As a partial payment of the final fee, a $2,000.00 case retainer fee is due upon acceptance of the case and receipt of the case file, which will be applied to that portion of the final invoice based on the hourly charges outlined herein. The minimum fee for all case file reviews is $2,000.00, which must be submitted with this signed Fee Agreement acknowledging Todd L. Mutchler's role as a consultant/expert in the case. The retainer fee is not a flat fee and does not represent the final fee; instead, it acts as

15

a deposit to secure Todd L. Mutchler's retention as an expert in your matter. By signing this agreement, you acknowledge and agree that the total fee cannot be accurately predicted, as the time required is uncertain and often involves complexities that are not immediately apparent at the start of a case. Additionally, you acknowledge and agree that the total fee is NOT contingent on the outcome of your case.

Reviewing provided materials, preparing reports, conducting necessary research, holding telephone consultations, accounting for travel time, and performing other case-related work will be billed monthly through itemized invoices for all services rendered at a rate of $250.00 per hour.

Depositions will be billed at $300.00 per hour, with a three-hour minimum. Any deposition time that extends beyond three (3) hours will be billed in half-hour increments at $300.00 per hour. The minimum deposition fee of $900.00 must be paid at least five business days before the scheduled deposition. Time spent preparing for depositions and responding to a subpoena duces tecum will be billed at $300.00 per hour. A cancellation fee of $1,000.00 will be charged to opposing counsel if they cancel the scheduled deposition within 72 hours of the planned time.

Failure of either party to pay fees before the deposition will result in the cancellation of the deposition date, and a fee of $900.00 will be assessed. This fee will be in addition to any future deposition fees billed under this agreement. Fees are due within 15 days of cancellation or settlement. The retaining firm shall present the above deposition fees and payment policies to opposing counsel. In the event of any disagreement regarding the amount, the firm retaining Todd L. Mutchler shall pay the difference or the total amount at the start of the deposition.

## TRIAL TESTIMONY

Thorough preparation will occur before the trial, and the fee will be $250.00 per hour, based on the actual hours worked. Todd L. Mutchler will reserve the agreed-upon trial day, travel to the trial site, and bill portal to portal for travel time at $250.00 per hour, plus all expenses. Additionally, trial testimony will incur a charge of $3,000.00 for each day or portion of a day spent testifying. Any standby days, or portions thereof, while awaiting trial will be charged at $1,500 per day.

If Todd L. Mutchler is scheduled to testify at trial but is not called as a witness, a fee of $1,500.00 will be charged if his appearance is not canceled at least three days prior to the scheduled date.

EXHIBIT B

## <u>Materials Reviewed for This Report</u>

1. IACP Body Worn Cameras Model Policy
2. IACP Search and Seizure Model Policy
3. MLEAC Accreditation Standards Manual (Edition 4)
4. Motorola Solutions Body-Worn camera BWC2-093248 (bouiewitnessstatement)
5. Motorola Solutions Body-Worn camera BWC2-093157 (BouieBC)
6. Motorola Solutions Body-Worn camera BWC2-093248
7. Motorola Solutions Body-Worn camera BWC2-089213

# EXHIBIT C

20

# TODD L. MUTCHLER

16499 Belfast
Fenton, MI 48430
734-260-5364
todd.mutchler@yahoo.com

- Public Administrator with extensive and broad-based government experience and degrees in Criminal Justice/Criminology (BA) and Interdisciplinary Technology (MA).
- Specific experience includes budgeting, organizing, personnel development, performance reviews, planning, team building and aligning/motivating staff toward achieving all departmental objectives.
- Strong leadership and people management skills; successful history of direct supervision, management and administration.
- Developed/implemented protocol, policy, procedures, methods and technology improvements.
- Expert at building/maintaining strong relationships with community groups (merchants, schools, civic leaders, politicians and vendors).
- Exceptionally strong communication/interviewing skills; able to encourage individual participation, provide feedback, and quickly identify, locate and resolve complex issues/problems.
- Recognized by supervisors, colleagues and subordinates as being a strong, ethical and dependable leader who consistently achieves difficult objectives through direct action and empowerment of others.

## PROFESSIONAL EXPERIENCE

**Northville Township, MI        5/2016 – 12/2024**

**Township Manager** (12/2019 – 12/2024)
- Responsible for the daily operations of Northville Township government.
  - Aligned structure, processes and systems with Board priorities.
- Responsible for managing a $39.9 Million Budget with fiscal responsibility.

### Related Accomplishments
- Led Department Director's through *Mission, Vision, Values* project (successfully adopted by board).
- Worked with staff to update township policy and work rules.
- Led Northville Township Government through Coronavirus pandemic.
- Achieved Top Workplaces status in 2023 & 2024 first municipal government to receive this distinction in Michigan.
- Received "Special Tribute" from the State of Michigan immense and impactful work in Northville Township.
- Received Congressional Recognition and Commendation for Service and Leadership.

**Director of Public Safety** (12/2016 – 12/31/2023)
- Responsible for the operation, administration, planning, and development of the 79-person Department of Public Safety.
- Managed $14,000,000.00 budget.

### Related Accomplishments
- Implemented CompStat (performance management and accountability) model for police and fire services.
- Restructured agency in support of effective and efficient delivery of safety services.
- Among first agencies in the State to Achieve Accreditation status through the Michigan Association of Chiefs of Police (MACP).
- Implemented and updated department policy.
- Implemented and updated processes and systems in support of effective workflow, delivery of services, and accountability practices.
- Completed first Public Safety Five-Year Safety Strategic Plan.
- Implemented in partnership with Growth Works Opioid response policy.
- Prioritized promoting a diverse workplace.

- MACP "Thomas A Hendrickson Legislative Advocate of the Year 2022"

## Canton Police Department – Canton, MI     4/1988 – 4/2016
**Director of Public Safety** (12/2012 – 4/2016)
- Responsible for the operation, administration, planning, and development of the 200-person, nominally consolidated police and fire department.
- Oversee the administering of a budget for police and fire in excess of $28,000,000.

### Related Accomplishments
- Implemented "Policing with Purpose" philosophy including "CompStat" model for police and fire services.
- Optimized staff accomplishments by efficiently managing goal setting process.
- Initiated/implemented departmental evaluation and development systems/methods.
- Recruited and retained diverse police officers aligning agency with demographics of community.
- Wrote a grant proposal; received $20K for Crime Mapping Dashboard technology.
- Contributing author to Canton Police Department's strategic plan.
- Developed model policy for religious head coverings; now implemented in Washington DC.
- Prioritized promoting a diverse workplace.
- Trained/coached/developed 10 Sergeants; introduced SRO information sharing meetings.
- Recommended partnering with Michigan Alliance Against Hate Crimes (MIAAHC).
- Worked with community coalition; drafted response plan for hate crime incidents.
- Recognized by Michigan Department of Civil Rights and International Association of Chiefs of Police for work on Hate Crimes Coalition.
- Wrote successful grant proposals for Simulator Training System Ford Fund and MMRMA Grant

**Police Lieutenant** (2010 – 2012)
**Special Services Lieutenant**; current
- Responsible for departmental training, new hires, Field Training Officers (FTO's), Communications Training Officers (CTO's), Detective Bureau, Special Enforcement Unit (Traffic) and Special Projects.

**Shift Commander**; prior
- Provided leadership to 16-member Platoon/Community Policing Team.

**SRO (School Resource Officer) Unit Commander**; prior
- Oversaw School Resource Officers; 4 high schools; 3rd largest School District in Michigan.

**Police Sergeant** (1998 – 2006)
- Served as Quartermaster; procured/maintained appropriate equipment levels.
- Held Field Training Officer Unit Supervisor and Selective Enforcement Unit Supervisor positions.

### Related Accomplishments
- Proposed use of Taser less-lethal technology; resulted in issuance to all officers.
- Initiated Directed Patrol at high crash intersections.
- Managed policy development and purchase of Emergency Restraint Chair.

**Detective Bureau Supervisor** (2001 – 2004)
- Supervised five direct-report Detectives; reviewed/assessed/assigned criminal case investigations.

### Related Accomplishments
- Originated Computer Crime Investigation position, Canton Police Department.
- Initiated/cultivated relationship with Internet Fraud Complaint Center (IFCC).
- Developed strong media relations using transparency in the release of information.
- Aligned call-back protocols with needs of organization.
- Managed multiple high profile cases utilizing collaboration, effective interviewing tactics,

22

communications, and follow-through techniques.

**Police Officer** (1988 – 1998)
- Special Operations Team (S.W.A.T.); 1989 – 2002
- S.W.A.T. Basic Training Instructor; 1997 – 2001
- Police Mountain Bike Officer; 1996 – 1998
- Field Training Officer; 1993 – 1998

### Prior Experience
- **Police Officer**, *Milan Police Department*, Milan, MI, 1987 – 1988
- **Police Officer**, *Eastern Michigan University, Department of Public Safety*, Ypsilanti, MI, 1986 – 1987

# EDUCATION / SPECIALIZED TRAINING
- Master of Liberal Studies in Interdisciplinary Technology, *Eastern Michigan University*, Ypsilanti, MI, 2002
- Bachelor in Criminal Justice/Criminology, *Eastern Michigan University*, Ypsilanti, MI, 1986
- Federal Bureau of Investigation National Academy Session 257, Quantico, VA, 2014
- Michigan Certified Public Manager Program, Saginaw Valley University, 2021
- Michigan Political Leadership Program (MPLP) Fellow – Michigan State University, 2020.
- Attended leadership Potential Seminar, sponsored by *FBI National Association*, 2012
- Attended New Chief's Training, sponsored by the *Michigan Association of Chiefs of Police*, 2012
- Attended Law Enforcement Executive Leadership Institute, *Central Michigan University*, 2012
- Attended Michigan Police Executive Development Seminar; sponsored by *FBI National Association*, 2011
- Executive Coaching, *Building Champions,* Lake Oswego, OR, 2007
- School of Police Staff and Command, *Eastern Michigan University*, Ypsilanti, MI, 2000
- Basic Police Academy, *Lansing Community College*, Lansing, MI, 1986

# INSTRUCTOR EXPERIENCE
- Ski instructor Vail Resorts/Mt. Brighton Michigan
- *Eastern Michigan University* School of Police Staff and Command Instructor (Professional Development)
- *Wayne County Regional Police Academy*, OWI Enforcement
- Certified, Less Lethal Weapons
- Certified, S.W.A.T.
- Chemical Weapons

# PROFESSIONAL CREDENTIALS / AFFILIATIONS / COMMITTEES
- Professional Ski Instructors of America (PSIA) Level I certified instructor (2022)

23

- Chairman Michigan Association of Chiefs of Police Legislative Committee (2020-2022)
- Wayne County Association of Chiefs of Police Executive Board, (President 2016)
- Southeastern Michigan Association of Chiefs of Police Executive Board (President 2015)
- Founding Member, *Canton Response to Hate Crime Coalition*, partnering with NAACP, Triangle Foundation, CAIR, Michigan Department of Civil Rights to address hate crime response/training/educating/healing/mentoring.
- Michigan Association of Chiefs of Police (MACP) District 1 (Wayne County) Representative (2014-2016)
- International Association of Chiefs of Police (IACP)
- Michigan Alliance Against Hate Crimes (MIAAHC)